UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ITG BRANDS, LLC,    Case No. _____

    Plaintiff,

vs.

BAYSHORE BEACH CLUB, LLC,

    Defendants.
_____/

## COMPLAINT

Plaintiff, ITG Brands, LLC ("ITG"), by and through undersigned counsel, files suit against Bayshore Beach Club, LLC ("Bayshore"), and alleges:

## NATURE OF THE ACTION

ITG is the third largest manufacturer of tobacco products in the United States. Its marketing operations are extensive. As part of its marketing, ITG prepaid millions to Zoom Insights, Inc. ("Zoom"), one of ITG's marketing companies. After receiving the prepayments and in breach of its contracts with ITG, Zoom ceased all operations in 2019 without performing all of the contracted for marketing services.

In pursuing Zoom in litigation in North Carolina, ITG learned that Zoom fraudulently transferred, among other things, approximately $500,000 to defendant Bayshore while Zoom was insolvent and without consideration. This is an action to recover the fraudulent transfers from Bayshore.

## PARTIES

1.     ITG is a limited liability company organized under the laws of the State of Texas with a principal office in North Carolina.  ITG's ultimate parent is Imperial Tobacco Group, PLC

("Imperial").  Imperial is a public limited company existing under the laws of Great Britain and publicly traded on the London Stock Exchange.  Imperial's principal office is in Great Britain. ITG is treated as a citizen of Great Britain for diversity purposes.

2. Upon information and belief, Defendant Bayshore is a developer of real property organized and existing under the laws of the State of New York with a principal place of business in Fort Lauderdale, Florida. Upon information and belief, none of Bayshore's members or ultimate parents are citizens or residents of Great Britain.

3. Bayshore is subject to personal jurisdiction in the Southern District of Florida because it (a) operates, conducts, engages in, or carries on a business or business venture, or has an office or agency, in Fort Lauderdale, Florida, which is also its principal place of business; (b) committed the tortious act alleged herein in Florida, and (c) is engaged in substantial and not isolated activity within Florida.

4. Non-party Zoom Insights, Inc. ("Zoom") is a corporation organized and existing under the laws of the State of North Carolina.

5. Non-party Tim Matthews ("Mr. Matthews") is an owner of and was the chief executive officer of Zoom at all relevant times.

**SUBJECT MATTER JURISDICTION, PERSONAL JURISDICTION, AND VENUE**

6. Upon information and belief, there is complete diversity between the parties.  ITG is treated as a citizen of Great Britain for diversity purposes. Upon information and belief, Bayshore is not a citizen of Great Britain or treated as a citizen of Great Britain for diversity purposes.

7. The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

8. Thus, subject matter jurisdiction exists under 28 U.S.C. § 1332(a)(2).

9. This action concerns Bayshore's extensive operations in the Southern District of Florida, real property that Bayshore developed in the Southern District of Florida, money that Bayshore received in the Southern District of Florida, and a contract that Bayshore entered into in the Southern District of Florida.

10. Thus, personal jurisdiction exists over Bayshore under Fl. Stat. § 48.193, among other statutes and constitutional principles.

11. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because this action concerns the extensive business operations of Bayshore in Fort Lauderdale, Florida; real property that Bayshore developed in Fort Lauderdale, Florida; money that Bayshore received in Fort Lauderdale, Florida; and a contract that Bayshore entered into in Fort Lauderdale, Florida.

12. All conditions precedent to this action, if any, have been satisfied, waived or excused.

## FACTS

I. **Zoom owes millions of dollars to ITG.**

13. In 2018, ITG entered into certain contracts with Zoom (collectively, the "Marketing Contracts").

14. Under the Marketing Contracts, Zoom was required to provide marketing and other market-related services to ITG or to procure marketing and other market-related services for ITG.

15. As part of the engagement, ITG provided millions of dollars to Zoom. Some of the funds were to be used to pay Zoom's fees. The vast majority of the funds were only to be used by Zoom to pay for the services that Zoom procured for ITG.

16. In breach of the Marketing Contracts, many of the contractors that Zoom procured for ITG were not paid in full.

17. In further breach of the Marketing Contracts, Zoom failed to provide all of the promised services.

18. Zoom collapsed in July 2019. At the time, Zoom owed ITG more than $4 million in addition to millions owed to other creditors.

19. Accordingly, at all times relevant to this Complaint, ITG held claims against Zoom and was one of Zoom's creditors.

20. Upon information and belief, at all times relevant to this Complaint, the sum of Zoom's debts has been greater than its assets at fair valuation.

21. Upon information and belief, at all times relevant to this Complaint, Zoom was unable to pay its debts as they came due.

22. Upon information and belief, at all times relevant to this Complaint, Zoom was insolvent.

23. On August 16, 2019, ITG sued Zoom to recover its damages for breach of the Marketing Contracts in an action captioned *ITG Brands, LLC v. Zoom Insights, Inc.*, Superior Court of Justice, Guilford County, Case No. 19 CVS 7932 (the "NC Litigation").

24. In its Answer, Zoom admitted to breaching the Marketing Contracts and failing to pay many of the contractors.

**II.   Zoom was insolvent and unable to pay its debts as they came due at least as early as August 2018.**

25. In the course of the NC Litigation, ITG gained access to Zoom's bank records and other relevant financial information. ITG makes the allegations contained in Paragraphs 25-37 below based on information learned from reviewing Zoom's financials.

26. At all relevant times, Zoom was heavily leveraged. Upon information and belief, its original lender was Fifth Third Bank. Zoom's debt service obligations to Fifth Third Bank exceeded $200,000 per month at all relevant times.

27. Additionally, Zoom took "friends and family loans" for millions of dollars from various individuals.

28. After debt service, Zoom's cash flow was thin to non-existent. Compounding the company's financial problems, Mr. Mathews generally used Zoom's funds as his own. For example, and as is at issue in this lawsuit, Mr. Mathews caused Zoom to pay Bayshore almost $500,000 as a down-payment for Mr. Mathews' personal condominium.

29. At least as early as August 2018, Zoom's cash position became desperate. At that time, Zoom began acquiring large sums of merchant cash advances.

30. In a merchant cash advance, an assignee-finance company provides the borrower cash in exchange for an assignment of the borrower's receivables. The assignor (the company taking the money from the finance company) pays the finance company a percentage of its receivables on a periodic basis.

31. Some cash-strapped companies use these arrangements because the finance company will advance funds quickly and with little documentation of income. Generally, finance companies offering merchant cash advances only require a borrower's bank statement as evidence of monthly receipts sufficient to support the payment obligations.

32. Merchant cash advances are finance arrangements of last resort. Such financing should only be used for short-term liquidity because the cost of such credit arrangements is enormous.

33. By way of example, Zoom obtained a merchant cash advance from World Global Capital in August 2018. Between August 2018 and May 2019, World Global Capital provided

approximately $547,000 to Zoom. During the same time period, Zoom paid World Global Capital approximately $957,000.

34. These enormous premiums are normal in the merchant cash advance industry.

35. By way of further example, Zoom received a $1,715,000 merchant cash advance from HOP Capital on February 19, 2019. Between February 19, 2019 and the close of Zoom's business in July 2019, Zoom paid HOP Capital almost $1 million. Despite paying almost $1 million on a $1.7 million dollar advance in less than six months, HOP Capital claimed that Zoom still owed it almost $1.9 million ($200,000 more than the original advance amount) as of August 1, 2019.

36. Zoom did not use its merchant cash advances for short-term liquidity. Rather, at least as early as August 2018, Zoom was relying on merchant cash advances as its primary form of financing.

37. Zoom's business finances spiraled and its debt soon escalated exponentially.

38. It is now clear that Zoom was insolvent and unable to pay its debts as they came due at least as early as August 2018.

### III. **While Zoom was insolvent, Zoom transferred large sums to Bayshore without consideration.**

39. Zoom made significant fraudulent transfers to Mr. Matthews and for Mr. Matthews' benefit in amounts to be proven at trial. Zoom continued this practice while it was insolvent and unable to pay its debts as they came due.

40. In particular, but without limitation, Zoom made the following fraudulent and avoidable transfers to Bayshore for the benefit of Mr. Matthews (collectively, the "Bayshore Transfers"):

| Date | Amount |
|---|---|
| On or about December 3, 2018 | $198,750 |
| On or about January 2, 2019 | $198,750 |
| On or about April 3, 2019 | $132,500 |

41. Bayshore was the initial transferee of the Bayshore Transfers. Each of the Bayshore Transfers occurred after Zoom reached the point where it was unable to pay its debts as they came due at least as early as August 2018.

42. The Bayshore Transfers are voidable.

43. As the initial transferee of the Bayshore Transfers, Bayshore is liable to ITG for the amount of the Bayshore Transfers.

IV. **Bayshore's forfeiture of Mr. Mathews' deposit is also voidable.**

44. In addition to Bayshore's direct liability to ITG as the initial recipient of the Bayshore Transfers, Mr. Matthews is also liable to ITG for the same and other voidable transfers that Zoom made to Mr. Matthews, on his behalf, or for his benefit.

45. Accordingly, at all relevant times, ITG was a creditor of Mr. Matthews.

46. In particular, Zoom made the Bayshore Transfers for the benefit of Mr. Matthews. As the beneficiary of the Bayshore Transfers, Matthews did not provide any value to Zoom in exchange for those transfers. Thus, these transfers are voidable in favor of ITG, Zoom's creditor. Mr. Matthews is also liable to ITG as the beneficiary of the Bayshore Transfers.

47. Upon information and belief, at all relevant times Mr. Matthews was insolvent and unable to pay his debts as they came due to ITG, among others.

48. Upon information and belief, Zoom's Bayshore Transfers were used as a deposit (the "Deposit") on a condominium, Unit No. 801 at the Wave on Bayshore in Fort Lauderdale, Florida (the "Condo") that Mr. Matthews intended to acquire from Bayshore.

7

49. Although voidable and fraudulently obtained, Mr. Matthews had valuable property rights in the Deposit.

50. Bayshore now claims that Mr. Matthews failed to timely close on the sale of the Condo. Consequently, Bayshore claims that Mr. Matthews forfeited any rights he may have had in the Deposit.

51. Bayshore did not provide any consideration to Mr. Matthews when Bayshore purportedly forfeited Mr. Matthews' rights in the Deposit.

52. The purported forfeiture was a voidable transfer of property of Mr. Matthews' valuable interest in the Deposit to Bayshore (the "Deposit Transfer"). Mr. Matthews was insolvent at the time of the Deposit Transfer and unable to pay his debts as they came due to ITG and others.

53. Bayshore provided nothing of value to Mr. Matthews at the time of the Deposit Transfer.

54. The Deposit Transfer is voidable.

**FIRST CAUSE OF ACTION**
Voidable Transfer – The Bayshore Transfers

55. ITG incorporates by reference each of the preceding paragraphs of this Complaint as if fully set forth.

56. ITG has been Zoom's creditor at all relevant times.

57. Zoom made the Bayshore Transfers at a time when it was insolvent and unable to pay its debts as they came due.

58. Zoom did not receive reasonably equivalent value for the Bayshore Transfers.

59. Zoom made the Bayshore Transfers directly to Bayshore.

60. Zoom did not receive reasonably equivalent value in exchange for the Bayshore Transfers.

61. Bayshore provided no value to Zoom in exchange for the Bayshore transfers.

62. The Bayshore Transfers are therefore voidable pursuant to N.C. Gen. Stat. §§ 39-23.4(a)(2), 39-23.5 and Fl. Stat. §§ 726.105(1)(b) and 726.106, among other statutes.

63. Bayshore was the initial transferee of the Bayshore Transfers from Zoom.

64. Therefore, ITG is entitled to judgment against Bayshore for the full amount of the Bayshore Transfers, including costs and interest, pursuant to N.C. Gen. Stat. § 39-23.8(b)(1)(a) and Fl. Stat. § 726.109(2)(a), among other statutes in favor of ITG.

**SECOND CAUSE OF ACTION**
Voidable Transfer – Deposit Transfer

65. ITG incorporates by reference paragraphs 1-54 of this Complaint as if fully set forth.

66. At all relevant times, ITG is a creditor of Mr. Matthews.

67. Mr. Matthews is liable to ITG for each and every voidable transfer that Zoom made to Mr. Matthews or on behalf of Mr. Matthews. Such transfers include, but are not limited to, the Bayshore Transfers.

68. Mr. Matthews is insolvent and has been unable to pay his debts as they came due at all relevant times.

69. Although fraudulent and voidable, Mr. Matthews had a valuable property right in the Deposit.

70. The forfeiture of the Deposit constituted a transfer of Mr. Matthews's property to Bayshore.

71. Mr. Matthews did not receive reasonably equivalent value from Bayshore in exchange for his rights in the Deposit.

72.	The Deposit Transfer is therefore voidable pursuant to N.C. Gen. Stat. §§ 39-23.4(a)(2), 39-23.5 and Fl. Stat. §§ 726.105(1)(b) and 726.106, among other statutes in favor of ITG.

73.	ITG is entitled to judgment against Bayshore for the full amount of the value that Bayshore received for the Deposit Transfer, including costs and interest, pursuant to N.C. Gen. Stat. § 39-23.8(b)(1)(a) and Fl. Stat. § 726.109(2)(a), among other statutes.

WHEREFORE, Plaintiff respectfully requests and prays that the Court:

1.	Enter judgment against Bayshore and in favor of ITG;

2.	Declare that the Bayshore Transfers and the Deposit Transfer are fraudulent and voidable;

3.	Order that ITG have and recover from Bayshore damages in an amount to be proven at trial but reasonably estimated to be the amount of the Bayshore Transfers;

4.	Tax all costs of this action against Bayshore and award the same to ITG; and

5.	Order such other or further relief as the Court deems just and proper.

Respectfully submitted, this 16th day of July, 2020.

Respectfully submitted,

**EDELBOIM LIEBERMAN**
**REVAH OSHINSKY PLLC**
*Attorneys for Plaintiff*
20200 W. Dixie Hwy., Ste 905
Miami, FL 33180
Telephone: (305) 768-9909
Facsimile: (305) 928-1114
Email: brett@elrolaw.com
Email: vivian@elrolaw.com

By: /s/ *Brett D. Lieberman*
Brett D. Lieberman (FBN 69583)
Vivian Bauza (FBN 90885)

-and-

BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
*Attorneys for Plaintiff*
P.O. Box 26000
Greensboro, NC 27420
Telephone: (336) 271-3167
Fax: (336) 232-9167

By: /s/ *Clint S. Morse*
 Clint S. Morse (NC Bar No. 38384)
 (*PHV Application to be filed shortly*)
 Jamey M. Lowdermilk (NC Bar No. 52271)
 (*PHV Application to be filed shortly*)

11

4812-7366-9564.v4